IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

KRISTIE FERRIS           )
                                  )
      Plaintiff,          )
                                  )
     v.                   )    Case No. 24-00522-CV-W-JAM
                                  )
VERTEX, INC.,          )
                                  )
      Defendant.     )

## ORDER

Before the Court is Defendant Vertex, Inc.'s Motion for Summary Judgment (Doc. 19). Defendant seeks judgment as a matter of law on all of Plaintiff Kristie Ferris' claims. For the reasons set forth below, Defendant's motion will be granted.

## I.    PROCEDURAL BACKGROUND

Plaintiff filed a Petition in the Circuit Court of Jackson County, Missouri, asserting claims for sex discrimination (Count I) and retaliation (Count II) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (Doc. 1-2) Defendant removed the case to this Court pursuant to 28 U.S.C. § 1331 and submitted its Answer. (Docs. 1, 4) Defendant filed the instant Motion for Summary Judgment, Suggestions in Support, and audio exhibits. (Docs. 19, 20, 21) With leave of Court, Plaintiff filed her Opposition, to which Defendant replied. (Docs. 22, 23, 24, 25)

## II.    LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (citations omitted). The moving party bears the burden of

showing no genuine issue of material fact, and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 256 (1986). A court must view the facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions," however, and thus not proper for resolution on summary judgment. *Anderson*, 477 U.S. at 255.

With regard to the procedural mechanism for summary judgment, Federal Rule of Civil Procedure 56(c)(1)(A) provides that a party asserting or disputing a proposed fact must do so by "citing to particular parts of materials in the record" to support such assertion or denial. *See also* L.R. 56.1(a)-(b). The party opposing a fact "must properly support its denial in accordance with Fed. R. Civ. P. 56(c)." L.R. 56.1(b)(1). Unless specifically controverted, proposed facts are deemed admitted for the purpose of summary judgment. Fed. R. Civ. P. 56(e)(2); L.R. 56.1(b)(1), (c). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin,* 483 F.3d 516, 527 (8th Cir. 2007) (citing *Celotex Corp.*, 477 U.S. at 324).

### III.    UNDISPUTED MATERIAL FACTS

Plaintiff did not contest Defendant's Statement of Uncontroverted Facts ("DSUF"). (Docs. 20, 24) Accordingly, all of the DSUF are deemed admitted for purposes of this motion, and, to provide context for the decision, are summarized in part below. Fed. R. Civ. P. 56(e)(2); L.R. 56.1(b)(1).

Plaintiff asserts nine Additional Material Facts ("PSUF") to support her position of sex discrimination and retaliation, including an assertion that she was forced to resign. (Doc. 24) PSUF 1 and part of PSUF 2 rely on inadmissible hearsay as to co-worker Mikeisha. *See Brooks*

*v. Tri-Sys. Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005) (hearsay evidence cannot be used to support or defeat a summary judgment motion). The remainder of PSUF 2 is based on Plaintiff's subjective perception of dismissiveness. PSUF 3 is contradicted by a September 16, 2022, call recording, which contains no threat of termination, and thus creates no genuine issue of material fact as to any alleged threat of termination. (DSUF 57; Doc. 20-3; Doc. 21, Exh. C) PSUF 6 lacks evidentiary support, as Plaintiff's testimony (Doc. 20-1; 89:1-22) does not reflect that her supervisor, Sheera Deepak, would not listen to her long enough to understand what her requests actually entailed and blew her off. The citation does reflect Plaintiff's perception of dismissiveness. *See Thomas,* 483 F.3d at 530 (affirming summary judgment for defendants on gender discrimination claim based on plaintiff's unsupported and conclusory allegations). PSUF 7 is partially unsupported, as Plaintiff admitted she was unaware of Deepak's interactions with male colleagues. (DSUF 42; Doc. 20-1; 98:4-20) PSUF 4, 5, 8, and 9 are uncontroverted. Relevant portions of the uncontroverted facts are incorporated into the factual recitation below.

Plaintiff Kristie Ferris worked with Thomas Tarleton at the Empiric consulting firm to discuss employment opportunities at companies, including Vertex. (DSUF 1) Tarleton told Plaintiff that the Vertex position involved an innovative connector for Salesforce,[1] which would match up with her Salesforce experience. (DSUF 2) On April 28, 2022, Plaintiff participated in an interview call with Vertex employees which included Deepak, a Release Manager, and a Scrum Master for Agile Team. (DSUF 3) The position was a new role and part of a new division at Vertex. (DSUF 9) Plaintiff understood that Deepak had previously been doing the work, and that a new team was being formed to include at least three new hires and some former Vertex people.

---

[1]Salesforce is a cloud-based Customer Relationship Management ("CRM") platform that helps businesses manage customer data, sales operations, and marketing campaigns. Jody Farrar, *What Does Salesforce Do?*, SALESFORCE (Feb. 7, 2025), https://www.salesforce.com/blog/what-does-salesforce-do/ (last visited Aug. 15, 2025).

3

(DSUF 10)  Deepak had no management experience before taking over the team.  (DSUF 11)

Plaintiff received an offer letter with a start date of June 13, 2022.  (DSUF 13)  Prior to beginning work at Vertex, Plaintiff also met Deepak's supervisor, Claudia McKee.  (DSUF 6)  Plaintiff liked McKee very much and never had any problems with her.  (DSUF 7)  Plaintiff did not view McKee as saying or doing anything differently toward her because she was a woman.  (DSUF 8)  Plaintiff understood Vertex prohibited sex discrimination as part of her onboarding.  (DSUF 15)

While Plaintiff reported to the Vertex headquarters in King of Prussia, Pennsylvania, she worked remotely from her home in the Kansas City area and did not work in the same office as Deepak.  (DSUF 16)  Plaintiff expected to serve as a technical product manager on the Agile Team, contributing to the development of functions and features for a connector that Vertex was developing to link its systems with Salesforce.  (DSUF 12)  After starting at Vertex, Plaintiff perceived that Deepak expected her to fulfill the roles of both a product manager and a product owner, despite the distinct differences between the two.  (DSUF 17)

Shortly after she started, Deepak gave plaintiff a "go-to-market checklist", but she was concerned that he did not give her an introduction to the products for which she was building connectors.  (DSUF 18)  Deepak was overwhelmed by starting the new team and division, and he and the team were swamped and without any clear direction.  (DSUF 19, 20)  Plaintiff tried to schedule "touchpoint" meetings with Deepak, several of which were canceled, showing how busy they were.  (DSUF 21)  Plaintiff does not know whether Deepak was having regular one-on-one meetings with her male peers (DSUF 42), though she perceived that male coworkers were able to get one-on-one meetings with Deepak.  (DSUF 42; PSUF 7)  Plaintiff perceived much confusion about her responsibilities and role; at times, when Plaintiff talked with Deepak to understand

4

aligning with others on the team, Deepak responded, "you're a grown woman" or "you're a grown adult, work with them." Plaintiff viewed these responses as Deepak pushing off the issue. (DSUF 22) Deepak seemed bothered when Plaintiff asked him questions and would respond by saying, "I hired you 'cause you know Salesforce." (DSUF 30) Plaintiff perceived Deepak as being dismissive, acting openly annoyed with her, shutting down her comments and questions, and saying she was an "adult woman" and to figure it out. (PSUF 2) Plaintiff described her experience with Deepak as "living in the twilight zone" because she perceived Deepak would not acknowledge her or a female co-worker Mikeisha, but he spoke with males on the team like "buddies" excited about what they were working on. (PSUF 5) Plaintiff was hurt by Deepak's conduct towards her. (PSUF 9) Deepak told Plaintiff she was doing a good job each time he conversed with her. (DSUF 41)

Plaintiff did not know who should have been responsible for marketing initiatives at Vertex. (DSUF 26) Although marketing initiatives needed to be done, Plaintiff believed someone else should do the work. (DSUF 26) Deepak introduced Plaintiff to Steven Johnston, whom she described as "a very amazing marketing employee" who was "super helpful and super knowledgeable" and "a go to person for questions... ." (DSUF 23) Plaintiff described Vertex as "a mess" in a text to Tarleton; by this she meant there was "clearly no structure. Nobody knew what the teams were responsible for... . They were clearly struggling trying to gather that . . . [N]obody really had any definition." (DSUF 24) Plaintiff also spoke with Tarleton about her job description; he informed her that he had consulted someone at Vertex, and based on what he shared, Plaintiff understood that both the individual Tarleton contacted, and McKee, agreed marketing initiatives were not expected as part of her role. (DSUF 25)

On August 15, 2022, partly due to feeling dismissed by Deepak, Plaintiff had a one-on-one conversation with McKee to discuss the team's Salesforce activities, and McKee introduced her to colleagues to help her better understand Vertex's products. (DSUF 27) Plaintiff's concern regarding Deepak's dismissive behavior arose from her observations that: (1) he canceled meetings she scheduled, citing busyness; (2) during group meetings, he engaged with male colleagues but did not respond to Plaintiff and another female; and (3) he did not provide Plaintiff with the time or training she needed. (DSUF 28)

On August 25, 2022, Plaintiff texted Tarleton that she was "hanging on by a thread" and was starting to look for a different job. (DSUF 32) On August 29, 2022, Plaintiff spoke with McKee to get alignment and understanding, and she found McKee to be supportive and "helpful for sure." (DSUF 35)

On August 30, 2022, Plaintiff recorded an 18-minute call with Deepak using her cell phone, without informing him. (DSUF 36, 38; Doc. 20-2; Doc. 21, Exh. B) The August 30 call was consistent with Plaintiff's other interactions with Deepak; she perceived him as dismissive toward her. (DSUF 37) Specifically, during the call, Plaintiff told Deepak "Nobody even gave us time, all of us connectors, no one ever gave us time to learn about the products we support." (DSUF 39.a.) Plaintiff reminded Deepak he had previously told her "you're doing a great job, don't expect to know it all overnight." (DSUF 39.b.) Deepak said, "You are still doing a good job. But at the same time, I think you're probably overwhelmed with some of these things." (DSUF 39.b.) After Plaintiff commented that she was not provided a knowledge share on her connectors, Deepak explained, "[b]ecause we didn't have anyone to give you that knowledge and I don't know anything about Salesforce connectors." (DSUF 39.c.) Deepak told Plaintiff, "if you are running into challenges, I want you to be upfront and put this in an email." (DSUF 39.d.) He added "[I]t's

6

just that we're stretched thin." (DSUF 39.d.) Plaintiff said to Deepak, "it's not fair to you. It's not fair to me. . . . I feel horrible for you. I do. I understand it." (DSUF 39.e.) Deepak told Plaintiff, "I'm going to ask you to put this all in an email exactly what tools you want, what training you want, what timeline you want." (DSUF 39.f.) Deepak told Plaintiff, "list it out in an email exactly what you need, what tools you need, what training you need and what timeline you need, right? I just need that information. ... [J]ust because I'm going to spend more time with you, it doesn't mean that things are going to change. To be honest. I need actionables." (DSUF 39.g.) Plaintiff responded, "Well then maybe we need to go ahead and part ways then." (DSUF 39.h.) Overall, Plaintiff conversed with Deepak for 18 minutes. (DSUF 36, 38) Before the August 30 call, Plaintiff had a total of 36 minutes of one-on-one time with Deepak. (DSUF 40)

On August 31, 2022, Plaintiff had about a 20-minute meeting with Deepak, McKee, Ken Brajevich (who ran the relationship between Vertex and Salesforce), and a few others. (DSUF 43, 44, 46, 48; PSUF 8) Plaintiff perceived that Deepak became embarrassed during the August 31, 2022, meeting and, at one point, told her to "shut up and be quiet" in front of coworkers and supervisors. (DSUF 43; PSUF 8) Following the meeting, Brajevich reported Deepak's conduct to Vertex Human Resources ("HR") and Plaintiff was granted two days off. (DSUF 44, PSUF 8) Plaintiff did not contact HR herself but appreciated Brajevich's actions. (DSUF 44) After the August 31 meeting, Plaintiff had no other interaction with Deepak. (DSUF 46) Plaintiff understood that Brajevich informed Employee Relations Consultant Kathy Beckman that Plaintiff had recorded the August 30 call with Deepak. (DSUF 48)

On September 2, 2022, Beckman sent Plaintiff an e-mail, copying HR representative Lori Silva, stating, "Lori and I would like to meet with you this morning if possible. I understand that you have raised some concerns about your role and your manager, Sheera [Deepak]. I would like

to get your perspective on this situation so we can work toward a resolution." (DSUF 47) Plaintiff understood that Beckman's September 2 email was in response to the August 31 group meeting. (DSUF 48)  On September 6, 2022, Plaintiff had a telephone call with Beckman, describing the confusion over what her role should be and her experience with Deepak.  (DSUF 49)  Plaintiff relayed that Vertex did not have correct leadership in place because Deepak did not have the experience or planning to run the team.  (DSUF 49)  Beckman told Plaintiff that Plaintiff should not have secretly recorded the call with Deepak.  (DSUF 50)  Beckman also raised a concern that Plaintiff had made negative comments about Deepak to Tarleton.  (DSUF 52)   Beckman asked what Plaintiff would like to see come from HR's involvement, and Plaintiff stated role clarity and training on Jira and relevant products, to which Beckman responded she would follow up with Deepak and research Plaintiff's role further.  (DSUF 51)

On September 8, 2022, Beckman sent Plaintiff an e-mail requesting a transcription of the August 30 recorded call with Deepak, stating, "You have raised a hostile work environment claim, which is a serious claim.  Therefore, it is important that Lori [Silva] and I review any and all information you may have in support of this claim."  (DSUF 53)  Plaintiff responded that she was working on it and "I will have it to you by the end of the day on Friday 9/9."  (DSUF 53)  Plaintiff never provided a transcript of the August 30 call.  (DSUF 53, 54)

On September 16, 2022, Plaintiff had a 40-minute follow up telephone call with Beckman and Silva, which she recorded without telling them.  (DSUF 55, 56; Doc. 20-3)  The call focused on Plaintiff's role and Plaintiff's understanding of what her role should be.  (DSUF 57.a.)  Beckman relayed that the work Deepak was telling Plaintiff she was responsible for was not consistent with what she was actually doing or what she was told about the responsibilities of her position, and the job description within her personnel file would probably need to be updated.

(PSUF 4)  Beckman told Plaintiff that Beckman had not yet completed a full investigation of Plaintiff's hostile work environment claim.  (DSUF 57.b.)  Beckman explained the legal meaning of a hostile work environment and what an investigation would entail.  (DSUF 57.c.)  Beckman asked about Plaintiff's August 30 call with Deepak, noting that she did not need a word-for-word transcription, but Beckman needed to know what Deepak said.  (DSUF 57.d.)  Beckman said she would then complete a full investigation and, if she found evidence that Deepak violated Vertex policy, the Company would take action on that.  (DSUF 57.d.)  Beckman told Plaintiff it was not very professional for Plaintiff to tell Empiric specific things about Deepak because Deepak was still hiring for his team through Empiric.  (DSUF 57.e.)  Beckman told Plaintiff she would be receiving a warning for recording the call with Deepak because it violated the company code of conduct and Pennsylvania law.  (DSUF 57.f.)  Plaintiff challenged the legality of the recording, noting that she was not in Pennsylvania when she recorded the call.  (DSUF 57.f.)  Beckman responded that Deepak was a Pennsylvania resident, but the crux of the matter was professionalism, code of conduct, acceptable use policy, and company values.  (DSUF 57.f.)

After further discussion about the legality of the recording, Beckman said, "I think honestly that you're splitting hairs about this so much over something, that's actually kind of concerning to me.  I mean, this isn't a negotiation.  I do have to be honest with you.  I want to let you know this is coming, but I'm not negotiating about this warning .... This is something that we feel obligated to do because of our practices.  We would do this for any employee, and I wanted to give you the heads up about this."  (DSUF 57.g.)  Plaintiff responded "Okay.  I'm going to go ahead and tell you that I'm going to go ahead and resign and I'm going to work with my lawyer with this.  So take this as my resignation."  (DSUF 57.h.)  Plaintiff never received a write up, as she ended her employment with Vertex that day.  (DSUF 58)  Plaintiff felt like she had no choice but to refuse

to sign a written counseling and felt forced to resign or be fired. (PSUF 3)

Following the call, Silva emailed Plaintiff accepting her resignation. (DSUF 60) After Plaintiff's resignation, the remaining communications she had with Vertex were about getting reimbursed for expenses and returning her company equipment. (DSUF 59) Plaintiff was later reimbursed for her expenses. (DSUF 61) During her three months of employment at Vertex, Plaintiff had less than one hour of solo interaction with Deepak, consisting of the 18-minute call on August 30 and a total of 36 minutes of one-on-one time prior to that. (DSUF 13, 38, 40, 60)

## IV. DISCUSSION

Defendant moves for summary judgment on Plaintiff's Title VII claims of sex discrimination and retaliation. As Plaintiff presents no direct evidence of discrimination or retaliation, the Court applies the *McDonnell Dougla*s burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973); *Heisler v. Nationwide Mut. Ins. Co.*, 931 F.3d 786, 794 (8th Cir. 2019). Under this framework, Plaintiff must first establish a prima facie case for each claim. *Heisler*, 931 F.3d at 794; *see also Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1055 (8th Cir. 2007). If successful, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory (or nonretaliatory) reason for its actions, which Plaintiff must then show is pretextual. *Heisler*, 931 F.3d at 794.; *Gibson v. Concrete Equip. Co., Inc.,* 960 F.3d 1057, 1062 (8th Cir. 2020). The Court views the facts in Plaintiff's favor, drawing all reasonable inferences accordingly. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587-88.

### A. Constructive Discharge

In opposing summary judgment, Plaintiff advances a new theory of constructive discharge. She contends that she was coerced into resigning on the September 16, 2022, call with Beckman, who threatened her with a disciplinary warning for the recording of her August 30, 2022,

10

conversation with Deepak, thereby leaving her no choice but to resign or face termination. (Doc. 24, pp. 5–7; PSUF 3) Plaintiff's attempt to assert a constructive discharge theory is both procedurally barred and substantively deficient.

Plaintiff alleges in her Complaint that "[i]n or about October of 2022, Defendant terminated [her] employment. Plaintiff's termination paperwork stated that she had quit her position when in fact Defendant terminated her." (Doc. 1-2, ¶¶ 60–61) In her opposition, Plaintiff now contends that she suffered an adverse employment action by being forced to resign by HR on September 16, 2022, and that similarly situated males were treated differently than her by receiving more supervisor attention, not being dismissed by the supervisor and not being forced to resign. (Doc. 24, p. 5) Plaintiff's claim of constructive discharge, raised only in her opposition, contradicts her pleading. *See Hildreth v. City of Des Moines*, 773 F. App'x 334, 335 (8th Cir. 2019) (noting that a party typically may not assert a new claim in opposition to a motion for summary judgment); *InfoDeli, LLC v. W. Robidoux, Inc.*, No. 23-3056, 2025 WL 1289348, at *3 n.6 (8th Cir. Mar. 5, 2025) (rejecting the plaintiff's attempt to assert new claims through passing references in opposition to summary judgment, and emphasizing that such claims must be raised by amendment under Rule 15(a), not through summary judgment briefing). Plaintiff has not moved to amend her Complaint, the deadline to do so has passed, and the Court declines to construe her opposition as such a request. *Id*.

Even if properly raised, or to the extent an assertion of constructive discharge would be viewed as consistent with her allegation of termination, Plaintiff's constructive discharge claim fails, as there is no genuine issue of material fact that Plaintiff did anything other than voluntarily resign. The Eighth Circuit's standard for constructive discharge requires that an employer deliberately create working conditions so intolerable that a reasonable person would feel

compelled to resign. *Yang v. Robert Half Int'l,* 79 F.4th 949, 965 (8th Cir. 2023); *O'Brien v. Dep't of Agric.,* 532 F.3d 805, 810–11 (8th Cir. 2008). "Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Yang*, 79 F.4th at 965 (quoting *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 496 (8th Cir. 1996)) (internal quotations and citations omitted). The evidentiary burden is "substantial." *O'Brien*, 532 F.3d at 810. And although Plaintiff abandons her hostile work environment claim in the briefing, with respect to her contention of constructive discharge viewed in the hostile work environment context, she must show "something more" than merely an actionable hostile environment. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004) (constructive discharge premised on a hostile work environment requires "something more" than actionable harassment); *O'Brien*, 532 F.3d at 811. As further detailed below, Plaintiff has not produced evidence sufficient to create a genuine dispute of material fact on this issue. Accordingly, Plaintiff's constructive discharge claim is both procedurally barred and, on this record, as discussed herein, fails as a matter of law.

### B. Sex Discrimination (Count I)

Plaintiff alleges sex discrimination under Title VII through disparate treatment and hostile work environment harassment theories in her pleading (Doc. 1-2 ¶¶ 67–80), although she abandons the hostile work environment theory in the opposing suggestions. Nevertheless, each theory is addressed in turn.

### 1. Disparate Treatment

To establish a prima facie case of disparate treatment, Plaintiff must show: (1) she is a member of a protected class; (2) she met Defendant's legitimate job expectations; (3) she suffered an adverse employment action; and (4) circumstances give rise to an inference of discrimination,

such that similarly situated employees outside the protected class were treated differently. *Parker v. United States Dep't of Agric.*, 129 F.4th 1104, 1112 (8th Cir. 2025); *Bearden v. Int'l Paper Co.*, 529 F.3d 828, 831 (8th Cir. 2008); *Gibson,* 960 F.3d at 1062. As the first two elements are undisputed (*See* DSUF 8, 39.b., 41; Doc. 20, p. 17), the analysis focuses on the third and fourth elements of the prima facie claim.

### a. Adverse Employment Action (Element Three)

An adverse employment action for discrimination claims is one that causes "some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024). The harm need not be significant or material, but it must be more than trivial or *de minimis*. *Id.; see also Cole v. Grp. Health Plan, Inc.*, 105 F.4th 1110, 1114 (8th Cir. 2024) (clarifying that after *Muldrow*, the harm need not be "significant," "material," or "serious"). Plaintiff's Complaint here alleges four adverse actions: (1) salary reduction from a promised $140,000 to $120,000; (2) assignment of a marketing checklist unrelated to her technical role; (3) refusal to reimburse Salesforce Dreamforce expenses; and (4) termination "in or about October 2022," falsely recorded as a resignation. (Doc. 1-2, ¶¶ 16–17, 22–23, 60–61, 64–66)

In opposing summary judgment, however, Plaintiff does not address these four allegations and instead asserts a theory of constructive discharge, claiming she had no option but to resign on September 16, 2022, due to the threat of disciplinary action. (Doc. 24, pp. 5–7) By failing to pursue the adverse actions alleged in the Complaint, Plaintiff has waived them. *See Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 540 (8th Cir. 2020) (failure to argue an issue in opposition constitutes waiver); *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009). She therefore cannot rely on those actions to create a genuine issue of material fact, and the Court need not construct arguments or identify supporting evidence on her behalf.

13

*Id.*; *Couch v. Am. Bottling Co.*, 955 F.3d 1106, 1108 n.2 (8th Cir. 2020) ("That is [plaintiff's] job, not ours.").[2]

Plaintiff's newly asserted theory of constructive discharge does not constitute an adverse employment action under *Muldrow's* "some harm" standard. The undisputed facts show Plaintiff voluntarily resigned on September 16, 2022. (DSUF 57.h., 60) The alleged working conditions — Deepak's remarks, perceived lack of support, and dismissiveness (DSUF 22, 30, 37, 39, 43; PSUF 2, 5, 7, 8, 9), canceled meetings (DSUF 21, 28), and an unissued warning (DSUF 57.f, 57.g, 58) — do not meet *Muldrow's* standard for "some harm" to a term or condition of employment and do not create objectively intolerable conditions so as to compel a reasonable person to resign. *See Brokken v. Hennepin Cnty.*, 140 F.4th 445, 450–53 (8th Cir. 2025) (constructive discharge requires objective intolerability). Here, Plaintiff has not identified working conditions so intolerable as to render her resignation objectively involuntary to the level of a constructive discharge.

Because no actionable adverse employment action occurred, and no triable issue remains on this element, Defendant is entitled to judgment as a matter of law on the disparate treatment sex discrimination theory.

---

[2]In any event, the undisputed summary judgment record does not support the adverse actions alleged in the Complaint, as none cause "some harm" to an identifiable term or condition of employment under *Muldrow*. First, Plaintiff's salary remained unchanged at the offered $120,000 throughout her employment. (Exh. A, Doc. 20-1, p. 15) Second, the one-time marketing checklist assignment, though misaligned with her product manager role, was addressed by HR on September 16, 2022, with support provided by skilled marketing colleague Johnston; it had no effect on her pay, title, or consistently positive performance feedback. (DSUF 12, 23, 25, 41, 57.a.; PSUF 4); *see Martinez-Medina v. Rollins*, No. 24-2282, 2025 WL 2047172, at *3 (8th Cir. July 22, 2025) (finding no adverse action for out-of-scope tasks, like those previously handled by higher-level staff, absent impact on term or condition of employment); *Muldrow*, 601 U.S. at 356. Team-wide disorganization — which stemmed from the new division's startup challenges — affected all members equally, including male colleague Brajevich, with no record evidence tying it to Plaintiff's sex. (DSUF 19–21, 45) Third, the alleged nonreimbursement for Dreamforce expenses is moot, as Plaintiff was fully reimbursed. (DSUF 61) Fourth, her voluntary resignation during the September 16, 2022, HR call precludes any termination claim. (DSUF 57.h.)

14

b.    *Inference of Discrimination (Element Four)*

To support the required inference of discrimination, Plaintiff claims Deepak favored male colleagues by giving them more attention and not being dismissive, assigned the checklist based on sex (Doc. 1-2 ¶¶  22-24, 70; DSUF 18, 22), made gendered remarks (Doc. 1-2 ¶¶ 30, 33, 46; PSUF 2, 8; DSUF 22, 43), and did not force male employees to quit (*see* Doc. 1-2, ¶¶ 60, 61, 71, 73; PSUF 3).  Although it is unnecessary to proceed further with the prima facie analysis, even assuming an adverse action, the undisputed facts reveal no circumstances suggesting sex-based treatment — such as more favorable treatment of similarly situated male employees, that would create a genuine issue of material fact.  *See Parker*, 129 F.4th at 1112.

Plaintiff's perception of favoritism — claiming Deepak treated male colleagues like "buddies" while being dismissive toward her  — is speculative and unsupported by specific facts. Notably, she acknowledged being unaware of whether Deepak held regular one-on-one meetings with her male peers.  (DSUF 42; PSUF 5)  Such unsupported allegations cannot create a genuine issue of fact.  *See Thomas,* 483 F.3d at 530.  Similarly, the checklist assignment does not support an inference of sex discrimination.  The undisputed record shows it arose from broader team-wide disorganization following the formation of a new division under Deepak's inexperienced leadership — not sex-based animus.  (DSUF 19–21; PSUF 4)  The lack of clear roles and direction affected the entire team, including male colleague Brajevich.  (DSUF 9, 11, 19–20, 24, 39.a., 45)

Plaintiff also relies on Deepak's "grown woman" remarks during conversations about aligning with teammates, suggesting they reflected gender stereotypes.  (DSUF 22; PSUF 2; Doc. 24, p. 2)   However, their limited frequency — occurring "sometimes" in less than one hour of direct interaction with Deepak over three months — combined with the disorganized team context, Deepak's consistent praise (DSUF 41), and a single gender-neutral "shut up" comment in a group

15

meeting (DSUF 43; PSUF 8), do not create a genuine dispute as to a discriminatory inference. Additionally, the forthcoming warning for surreptitiously recording the August 30, 2022, call with Deepak, which violated Vertex's company policy, was not issued, and Plaintiff provides no evidence of similarly situated male employees who engaged in comparable conduct but were not subject to a similar warning. (DSUF 57.f.–g., 58) And at a larger level, Plaintiff herself characterized the disorganization and lack of preferred guidance as affecting everyone. (DSUF 19, 20, 24, 39.a.) Even drawing all reasonable inferences in Plaintiff's favor, there is no evidence creating a genuine issue of fact, as she has not identified any similarly situated male employee treated more favorably or shown that sex played a role in the challenged conduct.

As no circumstances suggest sex-based treatment, and there is no genuine issue of material fact on this element, Defendant is entitled to judgment as a matter of law on the disparate treatment sex discrimination theory.

### c. *Legitimate Nondiscriminatory Reason and Pretext Analysis*

Even assuming Plaintiff could establish a prima facie case, the undisputed facts show Defendant's stated reason for the alleged adverse action of an undelivered warning — Plaintiff's violation of company policy by recording a call — is legitimate and nondiscriminatory. (DSUF 57.f.) Plaintiff identifies no evidence creating a genuine issue of material fact as to HR's uniform enforcement of that policy. (DSUF 57.g., 58) Moreover, Plaintiff has adduced no evidence creating a genuine issue of material fact that the company's actions, including that of HR and her supervisor, were pretextual. As Plaintiff cannot show pretext, *see McDonnell Douglas Corp*, 411 U.S. at 802–04, her disparate treatment sex discrimination claim fails as a matter of law.

## 2. Hostile Work Environment

To establish a prima facie hostile work environment claim under Title VII, Plaintiff must show she belongs to a protected group, was subjected to unwelcome sex-based harassment sufficiently severe or pervasive to alter her employment terms or conditions, and Defendant knew or should have known of the harassment yet failed to act. *See Johnson v. United States Postal Serv.,* 2025 WL 752247, at *1 (8th Cir. Mar. 10, 2025); *Mahler v. First Dakota Title Ltd. P'ship,* 931 F.3d 799, 806 (8th Cir. 2019); *Blake v. MJ Optical, Inc.,* 870 F.3d 820, 827 (8th Cir. 2017). As mentioned above, Plaintiff concedes this claim by not addressing Defendant's arguments. (Doc. 24, pp. 5–7); *see Paskert*, 950 F.3d at 540.

Nonetheless, in light of her Complaint allegations, and viewing the evidence in her favor, the record reveals no genuine dispute that the alleged conduct was neither motivated by sex nor sufficiently severe or pervasive to establish a hostile work environment claim. Plaintiff had minimal direct contact with her supervisor (less than an hour) in the short three-month employment period. And the cited behaviors — occasional remarks referring to Plaintiff as a "grown woman," a single "shut up" comment, canceled meetings, assignment of a marketing checklist, and perceived favoritism toward male colleagues (Doc. 1-2, ¶¶ 18–20, 22–23, 28–33, 35–38, 43, 46–47, 69–73; DSUF 11, 18–23, 36–43; PSUF 2, 5, 7–9) — do not rise to the level of actionable harassment. To be actionable, the conduct must be "extreme" in nature, surpassing mere rudeness or workplace unpleasantness. *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003).

Here, the interaction was sparse and the incidents were isolated, lacked physical contact or overt sexuality, and stemmed from broader team-wide disorganization. (DSUF 11, 18–23, 36–43; PSUF 2, 5, 7–9) Consequently, the alleged conduct falls short of the severe or pervasive standard

17

necessary to sustain a hostile work environment claim, and the Eighth Circuit has rejected such claims amid far more egregious allegations. *See McMiller v. Metro,* 738 F.3d 185, 188 (8th Cir. 2013) (affirming summary judgment for defendant on hostile work environment claim, holding that isolated incidents of unwanted kisses, embraces, and suggestive comments were not sufficiently severe or pervasive to alter the terms or conditions of employment)*; Anderson v. Fam. Dollar Stores of Ark., Inc.,* 579 F.3d 858, 862 (8th Cir. 2009) (affirming summary judgment for defendant on a sexual harassment hostile work environment claim, concluding that rubbing, pet names, and implied quid pro quo propositions over a short period fell short of the severe or pervasive threshold to create an actionable abusive environment); *LeGrand v. Area Res. for Cmty. & Hum. Servs.*, 394 F.3d 1098, 1100–03 (8th Cir. 2005) (affirming summary judgment for defendant on a sexual harassment hostile work environment claim, finding that repeated incidents involving sexual propositions, unwanted kisses, and groping were insufficiently severe or pervasive to affect employment terms). Moreover, the alleged harassment did not affect a term or condition of her job. Defendant is thus entitled to judgment as a matter of law on the hostile work environment theory contained in Count I of the Complaint.

## C. <u>Retaliation (Count II)</u>

To establish a prima facie case of retaliation, Plaintiff must show: (1) she engaged in protected activity; (2) a reasonable employee would have found the employer's actions materially adverse; and (3) the protected activity was the but-for cause of the adverse action. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation[.]"); *Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1147 (8th Cir. 2008).

Plaintiff's protected activity of reporting concerns about Deepak — as reflected by HR's acknowledgement of Plaintiff raising a hostile work environment claim (DSUF 49, 53) — is undisputed. The Court therefore turns to the remaining two elements of Plaintiff's retaliation claim.

### 1. Adverse Employment Action (Element Two)

A "materially adverse" employment action in the retaliation context is one that might dissuade a reasonable worker from engaging in protected activity. *B.N.S.F. Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *AuBuchon v. Geithner,* 743 F.3d 638, 644 (8th Cir. 2014). Retaliation claims require that the action be significant enough to deter opposition to unlawful conduct or participation in Title VII proceedings. *Id*. *Muldrow* explicitly distinguished retaliation claims, which continue to require a materially adverse action, as opposed to just "some harm." 601 U.S. at 357-58; *Cole*, 105 F.4th at 1114 (noting that *Muldrow* obviates significant or material requirement for discrimination claims but distinguishes retaliation claims, which retain a materially adverse action standard).

In her Complaint, Plaintiff alleges three retaliatory adverse actions: (1) non-reimbursement of Dreamforce expenses; (2) a termination threat during or after her protected activity; and (3) actual termination in October 2022, falsely represented as a resignation on paperwork (Doc. 1-2, ¶¶ 60–61, 62–66, 85). In her opposition, Plaintiff, for the first time, raises a disciplinary warning and coerced resignation as retaliatory acts, alleging she felt threatened by Beckman during the September 16, 2022, call — leading her to believe she had no choice but to resign to avoid being fired (Doc. 24, pp. 5–7; PSUF 3).

The originally pled retaliatory actions, while abandoned and therefore waived, as discussed, *supra* in Section IV.B.1.a., do not meet the materially adverse standard required for

retaliation. First, Plaintiff was fully reimbursed for her expenses (DSUF 61), precluding any actionable harm. Second, the record contains no evidence of a termination threat; Plaintiff's own recording of the September 16, 2022, HR call reflects only a discussion of a forthcoming warning for an unauthorized recording, not termination (DSUF 57.f.–g.). Third, no termination occurred, as Plaintiff voluntarily resigned on September 16, 2022, (DSUF 57.h., 60) and no evidence creates a material fact question as to a termination in or around October 2022. As these abandoned alleged retaliatory actions fail to demonstrate even "some harm" under *Muldrow*, 601 U.S. at 354–55, they cannot meet the higher *Burlington Northern* standard, which requires material adverse actions that would deter a reasonable worker from engaging in protected activity. Alleged actions that did not occur could have no such deterrent effect.

Plaintiff's newly asserted, unpled retaliatory actions — consisting of a disciplinary warning and coerced resignation — likewise fail. The threatened disciplinary warning for surreptitious recording (DSUF 57.f.–g., 58) was never issued and thus imposed no actual consequence. Moreover, it arose from a policy violation reported on August 31, 2022, before Plaintiff's protected activity. (DSUF 44, 48) The coerced resignation theory, based on Plaintiff's feeling during the September 16, 2022, call that Beckman was threatening her with a warning — which Plaintiff interpreted as an ultimatum to resign or be fired — is unsupported by the record. Plaintiff's own recording of the call confirms that Beckman did not threaten Plaintiff but instead informed her of a forthcoming warning for violating company policy by recording the August 30, 2022, call with Deepak (DSUF 57.h.). Beckman stated the warning was non-negotiable and consistent with company practices applied to any employee. (DSUF 57.g.) Plaintiff's subjective perception that she felt threatened and had to resign to avoid termination does not create a genuine dispute of material fact that the discussion would dissuade a reasonable worker from engaging in protected

activity. Despite the heads up on September 16, 2022, about a forthcoming warning for a policy violation which never came to fruition, HR previously and during that same call requested specifics from Plaintiff (September 8 and 16, 2022) about her concern regarding the August 30, 2022, recorded call with Deepak, yet Plaintiff never provided an account of that call so that HR could continue its investigation. (DSUF 53, 54, 57.d.) HR did address the concern about alignment of her role and agreed with Plaintiff in this regard. (PSUF 4) Moreover, following the August 31, 2022, group meeting, Plaintiff no longer reported to Deepak (DSUF 46), and HR addressed her concerns, reflecting an effort to remedy rather than retaliate (DSUF 47, 57.b.–d.; PSUF 4). These actions fail to show "some harm" under *Muldrow* in the discrimination context, as they did not alter employment conditions or terms, and thus cannot meet the higher "materially adverse" standard for retaliation.

No reasonable jury could find a materially adverse action from the perspective of a reasonable employee. Because Plaintiff has not and cannot establish a materially adverse action, her retaliation claim fails as a matter of law.

### 2. Causal Connection (Element Three)

Even assuming an adverse action, Plaintiff cannot establish but-for causation. The Eighth Circuit generally requires more than a mere temporal connection to infer causation, particularly where the alleged adverse action follows a non-retaliatory trigger, such as Plaintiff's policy violation. *Griffith v. City of Des Moines*, 387 F.3d 733, 738–39 (8th Cir. 2004) (affirming summary judgment on Title VII retaliation claim where temporal proximity was insufficient to establish causation, as the plaintiff's complaints followed notices of disciplinary hearings for workplace misconduct, and anti-discrimination statutes do not insulate employees from discipline for violating rules or disrupting the workplace); *Parker*, 129 F.4th at 1114; *Gibson*, 960 F.3d at

1065 (affirming summary judgment on Title VII retaliation claim where the plaintiff failed to establish a causal connection between her sex discrimination complaints — including a letter sent a few days before her termination — and her firing, as she offered no evidence beyond temporal proximity); *see also Littleton v. Pilot Travel Ctrs., LLC*, 568 F.3d 641, 645 (8th Cir. 2009) (no causation where adverse action responded to employee's conduct, not protected activity). Moreover, temporal proximity alone is insufficient to establish causation without evidence of retaliatory intent. *Sprenger v. Fed. Loan Bank of Des Moines*, 253 F.3d 1106, 1114 (8th Cir. 2001) ("[W]e have been hesitant to find pretext or discrimination on temporal proximity alone and look for proximity in conjunction with other evidence.") (citations omitted).

Although the forthcoming warning for recording the call with Deepak was communicated after her September protected activity, it was based on a report received on August 31, 2022 — prior to her complaint. (DSUF ¶¶ 44, 47–48; Doc. 24, p. 6) Because the conduct violation prompting the discussion of the unissued warning occurred and was reported before the protected activity, any causal connection is severed. Again, Plaintiff had no further contact with Deepak after the August 31, 2022, group meeting, and she was not issued a warning or any materially adverse consequence. (DSUF 46, 57.f.–h., 58, 60) Based on these undisputed facts, no reasonable jury could find causation, leaving no triable issue of material fact.

### 3. Pretext Analysis

Assuming *arguendo* a prima facie case, Defendant's legitimate, nondiscriminatory reason for the proposed warning — Plaintiff's violation of Vertex's code of conduct — defeats the claim. (DSUF 57.f.) Plaintiff offers no evidence to create a genuine dispute of material fact that this rationale was inconsistently applied to her for engaging in protected activity or masked retaliatory intent. *Hutton v. Maynard,* 812 F.3d 679, 684–85 (8th Cir. 2016) (stating that to succeed on a Title

VII retaliation claim, a plaintiff "must both discredit defendants' asserted reasons for [the adverse action] and show that the circumstances permit drawing a reasonable inference that the real reason for [the adverse action] was retaliation.").

Accordingly, Plaintiff's retaliation claim fails, as she cannot establish a materially adverse action or causal connection. Further, no evidence creates a genuine issue of material fact as to pretext. Defendant is entitled to summary judgment on Count II.

## V. CONCLUSION

Because Plaintiff fails to establish actionable claims for sex discrimination or retaliation, no genuine dispute of material fact exists, and Defendant is entitled to judgment as a matter of law, Defendant Vertex, Inc.'s Motion for Summary Judgment (Doc. 19) is **GRANTED**.

_____
/s/ *Jill A. Morris*
JILL A. MORRIS
UNITED STATES MAGISTRATE JUDGE